MaddeN, Judge,
delivered the opinion of the court :
We have this case pursuant to H. Res. 290, 84th Cong., 1st sess., the purport of which Resolution is shown in finding 2. The case has to do with the Government’s negotiating for, but never legally consummating, a lease on an apartment building in Washington, D. C., which building was under construction for the plaintiff in 1950. On October 30, 1950, when the building was 73 percent completed, the Government’s General Services Administration (GSA), which has the task of acquiring space for occupancy by Government agencies, was looking for additional space because of the expansion of Government activities resulting from the war in Korea.
A GSA representative inquired of the plaintiff as to the possibility of leasing the apartment building for Govern *53 ment occupancy. The plaintiff was willing, but the parties recognized that there were problems, one of which was whether the Federal Housing Administration (FHA),, would be willing to guarantee the mortgage on the property if it was to be occupied by the Government, and not by private tenants. This question and the numerous details about the elimination and storage of kitchen equipment and lighting fixtures, the extent to which the bathrooms were to be left unfinished, etc., accounted for a long period of negotiation.
On January 18, 1951, the plaintiff sent to GSA a written offer to lease the apartment building for $400,000 a year. GSA decided to advertise for space. The plaintiff bid in response to the advertisement, again offering its building for $400,000 a year. GSA prepared a lease of the plaintiff’s building and began to put it through the necessary channels for approval and execution. It did not send the lease to the plaintiff.
In the meantime, late in February, and in March and early April, 1951, the Armed Services Committee of the House of Representatives was taking an interest in GSA’s acquisition of additional office space, and on April 3 the Committee-concluded that the leasing of apartment buildings for office space was uneconomical and unwise, and wrote a letter to> the Secretary of Defense so advising him. GSA thereupon notified the plaintiff that it would not lease the plaintiff’s building.
During the period of several months in which both the plaintiff and GSA thought that GSA, either by a negotiated lease or by eminent domain, would acquire the occupancy of the plaintiff’s building, work on the building was carried on on the assumption that it was to be occupied by the GSA as office space. The water and waste pipes that would- have-emerged from the walls for the connection of fixtures were cut or left in the walls and plastered over. The painting of the rooms was done according to the directions of GSA.. The kitchen equipment was taken to storage off the premises.. A complicated and expensive special telephone installation was ordered from the telephone company and largely-completed.
*54 When it was decided that GSA would not lease the plaintiff’s building, the things that had been done on the assumption that the lease would be made had to be undone, and the building had to be completed for household occupancy by private tenants. This reconversion took money, and time. The significance of the time was, of course, that it delayed the completion of the building and its occupancy by rent-paying tenants.
The plaintiff says that the conversion and reconversion delayed the completion of the building for 5 months; that its net rentals would have been $336,682 per annum, or $140,284.15 for the 5 months. The Government says that the delay was much less than that, and points to several other causes of delay which had no relation to the abortive negotiations for the lease. The plaintiff claims this lost rent, as well as some $110,000 of out-of-pocket expense incurred in preparing the building for Government use and later reconverting it for private use. The items of that expense are listed in finding 53. As will appear hereinafter, we find it unnecessary to resolve the question of how long occupancy was delayed by the conversion and reconversion.
The plaintiff’s offer, made on January 1.8, 1951, proposed a lease for 1 year, renewable at the option of the Government from year to year up to April 1, 1956. GSA’s draft of a lease, never submitted to the plaintiff, was for an initial term beginning April 1,1951, and ending June 30,1951, with an option in the Government to renew from year to year thereafter, on giving 90 days’ notice. We suppose that the terms and dates proposed by the Government were intended to set the periods according to the Government’s fiscal year. We are not told whether it would have been legally impossible for the first period of the lease to extend into the following fiscal year. We suppose that the plaintiff would not have been willing to undergo the expense of the conversion with no contractual assurance of more than 3 months’ rent from the Government.
We know, however, from the plaintiff’s own offer of J an-uary 18, 1951, that it would have been willing to give GSA a lease for 1 year, with no assurance that it would be renewed. If then, the lease had been made as the plaintiff *55 desired to make it, it would have terminated at the end of the year, unless the Government elected to renew it. On its termination, the plaintiff would have had to make the same expenditures for reconverting the apartment building for private household occupancy that it had to make in the instant case. Bent paying occupancy by private tenants would have been delayed for the same length of time while the reconversion was being carried out. That means, of course, that the plaintiff, in being willing to make a 1-year lease, contemplated amortizing the anticipated ultimate expense of reconversion as far as possible during that year, and, as to the rest of it, speculated on the well founded probability that GSA, once it occupied the building, would renew its lease one or more times after the first year.
If the 1-year lease offered by the plaintiff had in fact been made, and if the Government had vacated the property at the end of the year, the plaintiff would have had neither a legal nor equitable claim to recover its unamortized costs of reconversion. It would merely be in a position of having its well founded expectations disappointed.
When one considers that the plaintiff, if it had obtained the Government’s signature on the lease which it was willing to make, would have subjected itself to the same expenses of storage and reconversion, and would have faced the same period of loss of rent while the building was being reconverted for private occupancy, one wonders why the plaintiff was willing to make such a lease. The answer must be that the lease to the Government at $400,000 a year compared to leasing to private tenants at $836,682 a year would have been enough more profitable to the plaintiff to justify this additional expense and loss of rent at the end of the Government’s occupancy. Since that occupancy could, according to the lease tendered by the plaintiff, have terminated at the end of 1 year, it is apparent, as we have seen, that the plaintiff was counting on several renewals by the Government to make up the part of the expense and loss which it would not recover during the year of the lease.
The plaintiff’s loss from the failure of the Government to accept the contemplated lease was the difference in rentals between the amount provided in that lease and the amount *56 which would have been received from private tenants during the period of the lease. That difference is $63,318. The-computation of the difference in rental cannot be carried beyond 1 year because, as we have seen, the plaintiff, if the contemplated lease had been executed, would have had neither a legal nor moral right to insist that the Government renew its lease and make further payments of rent..
The completion of the building according to the Government’s specifications, rather than according to the plaintiff’s original plan, was done because both the plaintiff and the Government assumed that they could agree on the terms of a lease, and that the lease would be made. The Government’s representatives in the negotiation had authority to execute a lease. The consummation of the transaction did' not fail because higher authority whose approval was necessary finally disapproved the contract. Cf. Kilmer Village Corporation v. United States, 139 C. Cls. 231. It failed because of the interposition of a force majeure, the expressed opinion of a Committee of the House of Representatives. The plaintiff acted, not without reason, on the assumption that' since it was dealing with those who had legal authority to make the lease, the lease would be made. It was not made and the plaintiff lost $63,318 because it had acted upon that assumption. Our conclusion is that the plaintiff has an equitable claim for that amount, if we use the expression “equitable claim” in the sense of one founded upon morality and good conscience. We so report to the House of Representatives.
It is so ordered.
Reed, Justice {Bet.), sitting by designation; Whttakee, Judge; Littleton, Judge; and JoNes, Chief Judge, concur..
FINDINGS OF FACT
The court, having considered the evidence, the briefs and. argument of counsel, and the report of .Commissioner-William E. Day, makes findings of fact as follows:
1. The plaintiff is a corporation, organized in 1949 under-the laws of the State of Maryland, and is engaged in the operation of an apartment house which it owns., known as. *57 The State House, located at 2122 Massachusetts Avenue,. N. W., Washington, D. C..
2. This action was filed pursuant to Resolution 290, of the United States House of Representatives, agreed to on July 19,1955. The resolution directs this court to report findings of fact and conclusions as shall be sufficient to inform the Congress of the nature and character of the demand of the plaintiff as a legal or equitable claim and the amount, if any, legally or equitably due to the plaintiff from the United States.
3. During all times pertinent to this proceeding, the officers-of The State House, Inc., were:
Jerry Maiatico_President.
George P. Lemm_Secretary-Treasurer and General Counsel.
Mathilda M. Kirchner_Assistant Secretary.
Bose Maiatico_Vice President.
4. Mr. Jerry Maiatico is, and for many year’s has been, engaged in the construction business in the Washington, D. C.,. area. He has constructed many large office buildings as well as apartments. He is a builder of demonstrated ability and experience.
5. Early in 1949, an insurance company as mortgagee, and Mr. Maiatico as sponsor for the plaintiff company, proposed mortgagor, made application to the Federal Housing Commissioner for an insurance commitment, pursuant to the terms of the National Housing Act, upon a loan of $2,600,000 for the purpose of constructing an apartment house of 313 family units, 885 rooms, 8 stories, with semibasement and subbasement.
Apparently the application was approved, since construction of the building commenced in August 1949 with an FHA insured loan in the amount referred to above. The building was constructed by Maiatico for the plaintiff company.
6. In the latter part of 1950, because of the hostilities in Korea, General Services Administration had been requested by various Government agencies to provide additional office space for such agencies. On about October 30, 1950, Mr. H. M. Fitzgerald, Chief of the Leasing Branch, Real Estate Division of the Regional Office of General Services Admin *58 istration, called Mr. George P. Lemm, an officer of tlie plaintiff company, to discuss another matter. In this discussion Mr. Fitzgerald told Mr. Lemm that it might become necessary to acquire the plaintiff’s apartment house for use as office space. At this time the plaintiff’s apartment house was 73 percent completed according to the FHA project inspection report.
As a result of Fitzgerald’s telephone call, Maiatico and Lemm, on October 31, 1950, went to Fitzgerald’s office to discuss the matter in person. It should be noted that Maiatico had had prior dealings concerning other buildings with this office, and at this conference (October 31) had extended discussions about proposals concerning the erection of an office building on the Cosmos Club site in Washington.
With regard to the plaintiff’s apartment project, the possibility of condemnation was raised by Mr. Fitzgerald. Maiatico indicated his willingness to lease the building when completed and discussed the proposed rental of from $400,000 to $425,000 per year stating that there would be about 200,000 square feet of space in the finished building. He raised the question concerning financing. He expressed some doubt as to whether FHA would continue to finance the existing Title 608 loan if the Government should lease the building for office quarters. On the same day Mr. Maiatico, on behalf of the plaintiff, wrote a letter to FHA requesting advice as to whether that agency would permit the building to be leased to the Government for office quarters and continue the insurance on the existing loan.
7. From about October 31,1950, to about January 18,1951, conferences were held almost daily between representatives of GSA and of the plaintiff.
• 8. By November 14, 1950, GSA was apparently dissatisfied with the plaintiff’s proposal because an assistant general counsel of that office telephoned Mr. Fitzgerald stating that Mr. Jess Larson, Administrator of GSA, had directed that the negotiation with the owner be stopped and to proceed at once with condemnation of the plaintiff’s building.
9. Mr. L. A. Ziernicki, Mr. Fitzgerald’s superior in the GSA regional office, by memorandum of November 14, 1950, to J. E. Moody,. Assistant General Counsel, in response to *59 the direction referred to above, made the following statement:
My only comment on this situation at the present moment is this. The asking prices of $425,000 rental per annum for the State House, and $365,000 rental per annum for the Boston House, appear to be within the limitations of the Economy Act. Undoubtedly, based on our conversation with Justice Department officials the other day, the. condemnation price would be considerably below the asking price, unless greatly increased by restoration costs, including loss of rent during the reconversion period at the conclusion of our tenancy. The acceptance of the owners’ proposal would place the responsibility of those costs basically upon the owners if an understanding is reached with them along those lines now. In view of this, I wonder if it would not be wise, before these letters go out, to reopen, momentarily, negotiations with the owners to get a firm reply to the questions as to whether they can complete any financial arrangements other than the Federal Housing Agency insurance method currently in force.
Incidentally, the offer from the owners of the Boston House was a voluntary action on their part since we did not solicit it. In the case of the State House, we telephoned the owner with regard to another matter and during that conversation we inquired as to whether he would be interested in leasing the State House to the Government. I believe that his offer was a result of our inquiry.
10. On November 15,1950, Mr. Fitzgerald called Maiatieo and then talked to Mr. Lemm, asking specifically:
If FHA insurance could not be continued — could you arrange private financing ?
Mr. Lemm told Mr. Fitzgerald that if the Government wanted the building it would be up to the Government to arrange financing. If the plaintiff went to the existing lender, that lender would probably take 30 days to make up its mind. He said further that the plaintiff actually had two Separate loans, one for construction and one for permanent financing. He mentioned a possible $78,000 penalty which might be imposed on default of existing loan terms and that even if a new lender might be secured (without FHA insurance) , which he doubted, it would in all probability be for a *60 smaller amount at a higher rate oí interest than the existing FHA insured loan.
11. On November 20,1950, Thomas C. Barringer, Director ■of the District of Columbia Office, Federal Housing Administration, sent the following letter to the plaintiff:
Reference is made to your recent inquiry as to whether or not FHA would approve the leasing of the above captioned project to the government for office quarters.
We have given this matter careful consideration and are of the opinion that a lease as proposed would not be in keeping with the intent and purposes of the National Housing Act.
12. Conferences were held at the office of the Commissioner of the Federal Housing Administration, attended by Mr. Maiatico and Mr. Lemm for the plaintiff, a representative of the plaintiff’s lender, an insurance company, and representatives of the General Services Administration. The results of such conferences were set forth in a letter dated December 12,1950, addressed to Franklin D. Richards, Commissioner, Federal Housing Administration, signed by Jess Larson, Administrator, General Services Administration. The letter reads as follows:
Reference is made to recent discussions between members of our respective staffs regarding the temporary utilization for Government offices of space in certain multifamily dwellings presently under construction within the District of Columbia through the use of funds obtained under mortgages insured by the Federal Housing Administration under Section 608 of the National Housing Act as amended (12 XJ. S. C., Sec. 1748). As you know, the situation with respect to space in which to house activities of the Government concerned with the defense effort is critical and it has been determined that the space most immediately available for this expanding and urgent defense need is that consisting of the apartment houses being so constructed. While this need is considered to be of a temporary nature, the probable duration cannot be estimated at this time. Reference also is made to a meeting regarding the matter which was held in your office on December 1, attended by you and various members of your staff; a representative of the Equitable Insurance Company; the builder of an apartment building presently under construction at 2122 Massachusetts Avenue and his *61 lawyer; and representatives of my staff. The following understandings were reached at this meeting and it is the purpose of this letter to confirm those understandings in general terms:
(1) That the Federal Housing Administration would cooperate with the General Services Administration in making such space available for temporary occupancy as Government offices;
(2) That the Federal Housing Administration would interpose no objection to negotiations toward that end' between the builders and the General Services Administration ;
(3) That the Federal Housing Administration would not consider such negotiations on the part of the owners-to constitute a violation of the convenants contained in and a part of the present financing and insurance arrangements, provided that the buildings are completed by . the present builders under existing financing- and insurance arrangements in accordance with existing plans and specifications, except for such modifications as do not effect a violation of Section 608 (b) (3) (C) of the N ational Housing Act as amended:
(4) That the General Services Administration and the owner will advise and consult with the Federal Housing Administration in woi’king out the details concerning any omissions and changes necessitated in any particular case by Government occupancy;
(5) That the portion of the principal amount of the-obligation of the insured mortgage representing the-costs to the owner of omissions and changes in the approved plans and specifications necessitated by Government occupancy of the premises, such as interior partition walls within single family units, kitchen equipment, lighting fixtures, etc., will be placed in escrow under arrangements between the Federal Housing Administration, the mortgagee and the owner, and made available upon termination of temporary Government occupancy for completion of the buildings in accordance with the original plans and specifications and/or other-adequate assurances that upon termination of such temporary occupancy the property will be completed as contemplated by the Federal Housing Administration commitment to insure;
(6) That the Federal Housing Administration as holder of the preferred stock of the mortgagor will not object to such changes in the mortgagor corporate charters if required, or will give such consent as may be necessary to authorize and enable the mortgagor to negotiate with the General Services Administration for the *62 temporary use and occupancy of the properties;
(7) That the General Services Administration will negotiate with the owners upon mutually agreeable terms, within the concept of this statement of understanding, for the temporary use and occupancy of the properties as office space and will furnish to the Federal Housing Administration a copy of each such agreement promptly after execution;
(8) That the term of any lease executed between General Services Administration and the owner will not begin to run until the building has been completed under existing financing arrangements in accordance with existing plans and specifications, as modified pursuant to understandings stated herein, and the original credit instrument finally indorsed for insurance by the Federal Housing Administration, provided that the Federal Housing Administration will expedite final insurance endorsement so as not to delay occupancy beyond physical completion of the building.
May I express to you my sincere appreciation of the manner in which the Federal Housing Administration has demonstrated its willingness to cooperate in this matter of providing urgently needed office space in which to house the defense agencies of the Government.
I shall appreciate receipt of advice from you at the earliest possible date as to whether the understandings as stated herein are consistent with your understandings resulting from the meeting referred to above.
13. The above quoted letter was replied to by Walter L. Greene, Deputy Commissioner, FHA, on December 18,1950, as follows:
I wish to acknowledge receipt of your letter of December 12, 1950, and confirm the statements enumerated therein. It is my understanding, however, that they are intended to apply only to those cases where the need of the Government for temporary conversion of the housing project to office use is so urgent that in the absence or a voluntary agreement of the nature described it would be your intention to institute appropriate condemnation proceedings to achieve such objective. If a statement to that effect in connection with each case could be submitted for our files, it would be of material assistance to us in maintaining our records.
I can assure you that, to meet the emergency you describe, we will gladly cooperate to the fullest extent possible consistent with our authority.
*63 On January 8,1951, Mr. Jess Larson confirmed, by letter, tbe further understanding of the parties referred to in the above quoted letter.
14. On January 12,1951, a conference was held at the GSA regional office, between representatives of the FHA, the plaintiff and GSA for the “purpose of determining what items of housing apartment equipment would remain in the building.” At this conference Maiatico expressed his wish to store the refrigerators and kitchen cabinets in the basement during occupancy by the defendant. He was told by GSA representatives, however, that it would be necessary for him to store the equipment elsewhere. Later that day, after the FHA representatives left the meeting, negotiations were had between representatives of GSA and the plaintiff concerning the amount of rental for the plaintiff’s building. Similar discussions were continued on January 15, 1951.
15. On January 15,1951, Everett L. Butler, Director, Communications Division, Office, Secretary of the Army, sent the following letter to the Chesapeake and Potomac Telephone Company, to the attention of Mr. J. B. Bowden, who was manager of Government service:
The following space has been allocated to the Department of Defense to house additional personnel under its expansion program:
Location . Component Telephone line requirements Date of occupancy
1438 TJ St. NW. AFSW-. 100 2-1-61.
State House.... Navy... 600 2-15 to 3-1-51.
Boston House.. A. F— 400 3-15 to 4-1-61.
119 D St. NB— Army... 160 2-1-51.
It is requested that immediate orders be issued for the installation of the necessary cable facilities to serve these locations on an off-premise basis from the Liberty 5-6700 equipment located at the Navy Building on Constitution Avenue.
16.On January 16, 1951, L. A. Ziernicki, Acting Chief, Beal Property Acquisition and Utilization Division of the GSA regional office wrote to Maiatico enclosing a copy of a letter of that same date from Ziernicki to Mr. Thomas C. *64 Barringer, FHA, stating that “I believe that you- will find, the items covered in the letter confirm the agreements reached in our recent conference.” [Italics supplied.]. The letter to Mr. Barringer is quoted in pertinent part below:
We have been in contact with the owners of the State House, located at-22nd and Massachusetts Avenue NW., and it has been determined that we will, in all probability, lease the building. • The one question still to be-settled is whether or not the asking, price of the owners will be too high to permit us to lease the building. It is our hope that the final price agreed upon will be acceptable to the owners, as well as the Government.
In connection with the subject property, representatives of the owners, of your office, and this office, have conferred, and it has been agreed as follows with respect to what items of building equipment will be installed now or whether installation will be delayed. Agreement has also been reached on the related items listed r [Italics supplied.]
1. All kitchen equipment, such as ranges, sinks,, refrigerators, cabinets, etc., shall not be installed.
2. All medicine cabinets-and other toilet accessories, including'toilet fixtures and wash basins,, shall be installed. The owners shall be responsible-to broom clean all tubs. The owners shall leave in place such protective covering as is now on these tubs. The Government shall not be responsible for the removal of this covering at the end of the Government occupancy. The Government will cover the tubs with a plywood or similar cover.
3. Laundry tubs in the basement shall , not be installed.
4. Asphalt tile flooring is to be installed on all floor surfaces with the exception of the bathrooms, which will be covered in accordance with the original apartment house plan. . ,
5. The lighting fixtures in the bathrooms, kitchens, corridors and lobby shall be installed. The proposed lighting fixtures in the bedrooms and dining rooms shall not be installed. All floor plugs provided for in the original apartment house plan shall be installed.
6. The painting color scheme shall be mutually agreed upon between representatives of the owners- and this office, it being understood, however, that this office shall not require the owners to paint in such, a manner as will necessitate a complete repaint *65 ing of the building when it is vacated by the Government. „
7. The elevators shall be provided with such devices as will permit manual operation. The owner requests that he be permitted to maintain the elevators and provide for such repair and maintenance as is necessary. He has agreed that maintenance will be on a twenty-four hour day basis. This office interposes no objection to the owner taking on this responsibility. •
8. The Government will install a plywood protector in such elevators as will be used for the movement of furniture and similar items, and shall also install- a protector in the elevator normally used for passenger elevators when such elevators are used for the movement of furniture and similar items.
9. The Government will install a plywood protector in order to prevent damage to the wall finish in the lobby.
The above information is forwarded in accordance with your request for use in such manner as you may deem appropriate.
17. On January . 18, 1951, Mr. Maiatico wrote a letter to Mr. Ziernicki in which he stated that due to certain engineering problems that would be encountered incident to a change in the elevators from automatic to manual operation, item 7 of Ziernicki’s letter to Mr. Barringer of January 16 should be eliminated. Maiatico ended his letter with the following statement:
We take this opportunity of stressing the importance of concluding our negotiations into lease form at this time as changes have been and are being made having in mind GSA occupancy.
18. Between January 16 and January 18, 1951, further negotiations between Mr. .Fitzgerald and plaintiff’s officers Maiatico and Lemm took place. These individuals took a Government lease form and discussed each of the provisions of the proposed lease and agreed with each other on a rental of $400,000 per annum. Following such discussions, George P. Lemm as attorney for the plaintiff, on January 18, 1951, sent to L. A. Ziernicki at GSA a written offer, to lease the plaintiff’s apartment. Such offer reads as follows:
*66 Having reference to rental negotiations concerning the above property, my client (The State House, Inc.) has authorized me to offer the rental of this property to you on the following terms for a period of one year, with option of the Government to renew from year to year on the same terms and conditions provided (a) notice be given in writing to the Lessor at least 90 days before the lease or any renewal thereof would otherwise expire and (b) that no renewal thereof shall extend the period of occupancy of the premises beyond April 1,1956:
1. Commencement of the lease term shall be April 1,1951; provided, however, partial occupancy, prior to commencement of the lease term, may be had by the Government and, in which event, proportionate rental (based upon extent of such partial occupancy) shall be paid for such period of partial occupancy;
2. Annual rent to be $400,000.00, payable monthly;
3. Maintenance, repair, and upkeep of the building and its mechanical equipment shall be done, and the cost thereof to be borne, by the Government, excepting that: Lessor will keep up the structural membranes of the building and such repairs to building and mechanical equipment which are due to obsolescence, faulty construction, and worn-out mechanical equipment;
4. The printed provisions of your lease “Form No. 2”, which are not inconsistent herewith, are acceptable. '
All of the enumerated items (excepting paragraph numbered 7) of your letter of January 16,1951, to FHA’s Mr. Barringer are acceptable.
19. Between October 31,1950, and January 18,1951, a great many conferences were held between representatives of the plaintiff and GSA, between them and representatives of the FHA, and between all of the above and the Commissioner of Public Buildings, as well as the General Services Administrator. In the beginning, these conferences were held almost daily.
Mr. Ziernicki has testified, and his testimony is accepted, that up until about the middle of November 1950, because of difficulty in reaching a point of determination (due to complications incident to the FHA insured loan), the GSA officials felt that the only way to ’ take the building was *67 •through the process of condemnation. The plaintiff’s representatives were so advised during the discussions with them. In this connection a problem of which both GSA and plaintiff’s representatives were well aware was the stoppage of construction work if condemnation was effected.
20. Sometime after January 18,1951, the GSA representatives concluded that formal advertisements for the renting of office space should be solicited and this was accomplished. A bid was received from the plaintiff and from one other bidder only (The Boston House). From the evidence of record negotiations had been carried on with the owners of The Boston House for additional office space which were similar to those between GSA and the plaintiff.
21. There is in evidence as defendant’s exhibit 17 a document entitled “Authorization Order,” signed by F. Kauf-holz, Deputy Regional Director, Public Buildings Service of the General Services Administration. This authorization order, dated February 23, 1951, apparently passed through and was approved by six subordinates of the deputy regional director since it - bears their initials. It appears to be a direction to the staff of the regional office to proceed with the leasing of the entire building known as “the State House” located at 2122 Massachusetts Avenue NW. The proposed effective date of the lease was indicated thereon as April 1, 1951 with a note that “(The Government will accept delivery of the premises in units of not less than a floor) ”. The estimated rental was shown at $400,000. The appropriation to be charged was shown. Under remarks was a note as follows r
Comptroller’s Office: Please indicate fund clearance in order that we may proceed with the leasing of the space described above.
Above the signature of Mr. Kaufholz there was a note in his handwriting, “Hold for clearance with Armed Services Committee.” It is not shown in the record when that note was placed on this exhibit. It was a reference to the committee of the House of Representatives which, on February 27,1951, held hearings at which representatives of the GSA were questioned by members of Congress concerning the *68 leasing of the plaintiff’s apartment building for office use' by the Department of Defense.
22. Further hearings were held by a subcommittee of the House Armed Services Committee on March 5, 6, 7, and 16, 1951. The matter of leasing of apartments for use as offices by the Department of Defense was the subject of testimony by witnesses before the subcommittee. The special counsel to the House Committee on Armed Services had, on March 1,1951, written to Mr. Thomas Barringer, Director of Federal Housing Agency Insuring Office in Washington. By his letter he advised that the subcommittee was inquiring into the proposed acquisition of Defense Agencies of three properties in the District of Columbia, one of which was The State House. Information was requested of that FHA official concerning data relating to the FHA commitments for mortgage insurance on the three properties mentioned “and in general all matters that were considered with reference' to the valuations involved and the insur-ability of this commitment.”
23. On March 2, 1951, leases, which had been prepared for execution by the interested parties on three apartment house projects, one of which was The State House, were transmitted to the Commissioner of Public Buildings. These leases together with supporting papers were sent to the official referred to for his approval, pi’ior to execution by either the owners of the apartment projects or by Mr. Ziernicki, as contracting officer on behalf of the Public Buildings Service, General Services Administration. One of the supporting papers was a copy of a proposed letter of transmittal of the proposed State House lease which had been prepared for signature by Mr. Ziernicki, but not signed by him, though initialed by six other officials, including Mr. Fitzgerald, his assistant. That letter, which is undated, unsigned, and not sent to the addressee, is quoted below :
The State House, Inc.,
Bear 1523 22(1 Street AW.,
Washington, D. O.
GentlemeN : This is to advise you that the Government accepts your proposal dated February 1,1951, and will lease, at an annual rental of $399,999.96, the entire premises known as the State House, located at 2122 Mas *69 sachusetts Avenue NW., Washington, D. C., situated on Lots 811, 812, 813, 814, 815, 816, and 13 in Square 67 of the District of Columbia.
The Government will accept delivery of the premises in units of not less than a floor. Kent at the rate of $399,999.96 per annum will be prorated to provide for payment of rent for the space delivered.
We have previously furnished you with a copy of our letter dated January 16, 1951, addressed to the officials of Federal Housing Administration, outlining our understanding with respect to such matters as kitchen equipment, bathroom equipment, type of floor covering, lighting fixtures, painting color scheme, and other related matters. It is understood that paragraph 7 therein is eliminated and that the remaining items covered in the letter to Housing are binding on the owners and are made a part of this commitment. As outlined in the January 16 letter to Housing, the Government will install a plywood protector in such elevators as will be used for the movement of furniture and similar items and shall also install a protector in the elevator normally used for passengers when such elevator is used for the movement of furniture and similar items. Further, the Government will install a plywood protector in order to prevent damage to the wall finish in the lobby of the building.
Attached is a lease covering the above-described space. Please have the original and all copies of the instrument signed, signature witnessed, corporative certificate, including seal, completed and return them to this office.
After execution by the Government, a copy will be returned for your use.
Very truly yours,
L. A. ZlERNICKI,
Chief, Real Property

Acquisition a/nd Utilization Division.

In the letter of transmittal of the proposed leases dated March 2, referred to above, the attention of the Commissioner of Public Buildings was called to the interest in the three leases that had been manifested by the Armed Services Committee of the House. It was stated that at a hearing a few days before, attended by the General Counsel, the Assistant General Counsel, and by Mr. Ziernicki and the writer, several of the Members of the Committee were rather inquisitive as to whether GSA had been diligent in negotiating *70 these leases, and also whether the Army’s need could be justified.
24. The proposed lease for The State House apartment which is referred to in the preceding finding was by its terms “made and entered into this 20th day of February” 1951 for the entire building for the term beginning April 1, 1951, and ending June 30, 1951, but with an option by the Government to renew from year to year on ninety days’ notice to the owner until June 30, 1956. The rental was to be $399,999.96 per annum, payable in monthly installments of one-twelfth the annual rent.
25. The Special Subcommittee of the House Armed Services Committee on April 3, 1951, reported to the full committee on its investigation of the requirements for office space by the Department of Defense. Its report reads in part as follows:
With these accomplishments the space needs of the Department of Defense will be reduced to a point where the normal functioning of the GSA will be able to accommodate the Department’s needs without leasing the two modern luxury apartment buildings, the Boston House and the State House.
The Committee feels that there is no present necessity for Government offices to be located in apartment buildings. All of the witnesses appearing before the Subcommittee agreed that kitchens, bathrooms, dining alcoves and bedrooms are not readily adaptable for office space. GSA stated that it preferred not to enter into leases for apartment houses; however, the newly created Defense Agencies have brought great pressure to bear upon the space people in GSA for office space to accommodate the additional federal employees being recruited for duty in Washington, D. C.
* * * ❖ *
RECOMMENDATIONS:
1. The Committee recommends that the Secretary of Defense examine the existing organizations and functions of the Department and adopt a program which will provide for the removal from the critical D. C. area those activities which are not essential to the Defense Program;
2. That no new organizational units should be considered for location in Washington, D. C. until every possibility of its being established elsewhere has been exhausted;
*71 3. That the. GSA in the performance of its function of procuring office space for the Department give adequate consideration to a better utilization of space by the nondefense activities housed in the City of Washington;
4. The Committee is of the opinion that the public interest will best be served if the GSA in the future in securing space for the Defense Department will analyze carefully the financial features of the acquisition and in instances where it would appear more economical to purchase rather than lease, recommendations to that effect should be made to the Secretary of Defense, notwithstanding the fact that GSA is presently without authority to purchase real estate in the District of Columbia;
5. The Committee recommends that no steps be taken to lease for the use of the Defense Department any luxury apartment buildings; and further recommends that no property be leased until Congress has been informed and given an opportunity of examining the proposal.
The report of the subcommittee was approved by the full committee on April 3,1951. On that same day the Chairman of the House Armed Services Committee sent a letter to the Secretary of Defense enclosing a copy of the report of the subcommittee and, commenting on the proposal by GSA to lease two apartment buildings in the District of Columbia, one being The State House, said:
# * * * *
The Committee has found that there is no need for the acquisition of the space in these two (2) buildings to serve the needs of the Defense Department’s actual requirements.
The Committee has found that these buildings are not adapted to utilization as office space; they are uneconomical for that purpose; that the proposed rental is excessive for that purpose; and that the requirements of the Defense Department do not present such an emergency as would demand the use of uneconomical space.
26. There is no evidence that the plaintiff’s representatives were advised by any representatives of GSA concerning testimony by the latter before the House Armed Services Committee or subcommittee thereof between February 27 *72 and March 16,1951. On the other hand, Mr. ZiemicM testified as follows:
We spent most of March waiting for some word from the committee. We did not feel that we should proceed with this project or any other apartment house project or even, as a matter of fact, the whole Department of Defense space requirement, until we had some expression from the Armed Services Committee.
27. On April 11,1951, Mr. Ziernicki sent the following let-to Mr. Maiatico:
This will confirm our telephone conversation of today.
Under the present circumstances, I have no alternate [sic] but to advise you that the General Services Administration has no intention of acquiring the use of the State House as an office building.
28. The State House was completed about August 15,1951. Some apartments were finished before that time and some were finished afterwards, but “a good mean average” completion date would be August 15, 1951.
29. Mathew G. Lepley was the architect who designed the plaintiff’s apartment house project and also furnished architectural services during construction. Mr. Lepley died two years prior to the trial.
30. On April 2, 1951, Everett L. Butler, Director, Communications Division, Office, Secretary of the Army, sent the following letter to the Chesapeake and Potomac Telephone Company:
This office was informed on 5 January 1951 by the space representative in the Office, Secretary of Defense that the General Services Administration had allocated the Boston and State House apartment buildings to the Department of Defense as part of an overall plan to house the anticipated increase of personnel in the Washington area.
Based upon these space committments [sic] it was agreed to by the undersigned with the engineers of your company that to provide the most efficient type of telephone service it should be accomplished on an off-premises basis from the Main Navy building, which would require direct tie cabling between the locations by the Telephone Co. and the addition of 1500 lines to the Main Navy Switching Equipment.
*73 Orders for the necessary cabling and additional lines were outlined in my letter of 15 January 1951.
_ This office has been informed by the space representative, Office, Secretary of Defense that recent developments, as indicated by newspaper accounts, may change the space picture to the extent that the Boston and State House may not be allocated to the Department of Defense.
It is, therefore, requested, that until the question is finally resolved, that orders be suspended for (1) off-premise service at these locations from Main Navy and (2) the 1500 line addition at Main Navy.
31. On May 8,1951, another letter was written to the telephone company, by Mr. Everett L. Butler, and handed to its representative at the Pentagon Building, in the following terms:
In my letter of 2 April 1951,1 requested that orders be suspended for (1) off-premise service between the Boston and State House apartment buildings and the Main Navy Building, and (2) the 1500 line addition at the Main Navy Building.
This office has been informed by the space representative, Office, Secretary of Defense that the Boston and State House buildings will not be occupied by the Department of Defense. It is therefore requested that the suspension orders outlined in paragraph one be changed to cancellation orders.
Termination charges, if any, on the order for the dial equipment and special charges applicable by tariff regulations to the equipment which has been installed to service the Boston House and State House should be billed to the Department of Defense, and forwarded to the Director, Communications Division, Office, Secretary of the Army, in order that payment may be made prior to 1 July 1951.
In billing such charges, if any, it should be kept in mind that (1)_ the dial equipment has not been installed and that portion which has already been manufactured can be utilized elsewhere in the Bell System, and (2) the cable is to be left in place for possible future use by the Department of Defense.
32. The telephone company submitted its bill in the sum of $91,449.41 for termination charges due to cancellation of the order for tie cable between the Navy Department Building and the Boston House and State House apartment build *74 ings, and also due to cancellation of the order for the installation of 1500 additional dial lines at the Navy Building. The bill was directed to Mr. Butler’s office and was paid by the defendant. Part of the cost included in the charges was for the placement and later removal of underground cable from the Navy Department Building on Constitution Avenue to the State House at 22nd and Massachusetts Avenue, N. W. Approximately $50,000 of the termination charges for telephone work was directly related to telephone service for The State House, and about $12,000 of that amount related to work performed by the telephone company for the defendant inside The State House building.
33. The FHA project inspection reports for the construction of the plaintiff’s apartment project show the following with respect to the percentage of completion on the date of inspection:
■ Date: Percent
November 6, 1950_■—
December 1, 1950_
December 28, 1950___ GO I ! I I I
January 29, 1951-_ I I I
March 1,1951_
April 4, 1951_^_•_
April SO, 1951_
May 81, 1951_ Ol
July S, 1951_
. July 31, 1951_ 50
' 34. On December 18, 1950, Mr. Ziernicki visited The State . House to observe the progress of construction. He observed the following with respect to this inspection:
Eighth floor — block partitions installed, metal lath ceilings in rooms but not in corridors, tubs in place, no tile in bathrooms, no plastering.
Seventh floor — same as above.
Sixth floor — same as above.
Fifth floor — same as above.
Fourth floor — most walls rough-coated to height of 6 feet, some tile in bathrooms.
Third floor — floors, walls and ceilings rough-coated, and bathrooms tiled.
Second floor — all rough-coated and bathrooms tiled, all white-coated except corridors.
First floor — all plastering finished, bathroom fixtures installed.
*75 Basement — all white-coated except corridors, all bathrooms installed. . . '■ • •
Heating connected in a number. of rooms,; but not throughout the building. No areas .cleared of debris.
. 35. In his cooperation with GSA, which wanted the building as soon as possible in units of at least one floor, Maiatico had departed from the usual plan of operations by completing the finishing operations from the ground up to the top floor. The usual method of construction for a multistoried apartment after the brick walls and masonry partitions are installed is to perform the finishing operations, such as tile setting, installation of plumbing fixtures,- and plastering'and painting from the top floor working down to the ground level. From the conditions observed by and testified to by Mr. Ziernicki, this change in operations had been accomplished- some time in November of 1950.
36. From about the middle of January 1951 to the first week in April 1951 the local telephone company was working in The State House in an effort to make telephone service available for Government occupancy. The telephone switchboard and panels which were especially designed- for the original requirement for apartment use had been set up in place and the necessary duct work was installed. The person in charge of the telephone company installation crew advised Maiatico’s superintendent that he had orders to take out the switchboard'and panels and to install different equipment for Government use. The telephone installers worked night and day from about January 15,1951, to the first week in April putting in the cables, lines, and terminal boxes. These boxes were about 4 inches wide and 12 inches long and about 3 inches deep. They were installed at the point on living room walls where the telephone cable came through the wall, except on the eighth floor. After April 11, 1951, they were all removed, and the holes where the cable came through the walls, and. where the screws attached the boxes -to the plaster walls, had to be patched with plaster and repainted.
37. One-third of the . kitchen wall, cabinets had been installed in the kitchens, when, because of the expected Government occupancy, they were taken out, and along withithe stoves and refrigerators and kitchen sinks for the 312 apart *76 ments were removed from The State House and sent to 2501 Q Street NW. for storage. This was an apartment house owned by Maiatico which had fire-proof space approved by FHA available for the storage of this equipment. All of the kitchen cabinets, both wall type and base cabinets, which were needed for apartment use were ordered and most of them had been delivered to The State House. When the change in schedule of operations took place, Maiatico stopped delivery on those cabinets which had not yet been delivered from the factory, at Bockville, Maryland. When GSA withdrew from the transaction with the plaintiff company, and the cabinets were needed, a fire had occurred at the factory which destroyed the undelivered kitchen cabinets, resulting in some delay for remanufacture.
38, The work of the plumbing subcontractor was materially increased as a result of the changes for Government occupancy and back again for apartment use. All of the rough work installations for apartment use from the ground floor up to and including the eighth floor were completed. The plumbing subcontractor was then required to cut into the plastered walls and cut off and recess into the walls gas lines in the kitchens, the hot and cold water and waste lines for the kitchen sinks, and cap or plug such lines. The plaster then had to be refinished where these pipes had protruded and had then been recessed into the wall. Then after April 1951 when the plaintiff was again finishing the building for apartment use, the plumbers had to come back, reopen the walls and extend hot, cold, waste, and gas lines in kitchens so that the gas stoves and kitchen sinks could be installed.
39. The work of both the plastering contractor and the painting contractor was seriously disrupted by the change in the schedule of operations occasioned by expected Government occupancy, and then reversion to apartment use. Labor for both of these operations was available as needed by these two subcontractors. From the testimony of each of these subcontractors it is concluded that each was extremely competent. The plastering was begun on October 23, 1950, and by following the usual and accepted construction schedule of operations would have been finished by February 1, 1951. The plasterer was about finished with the plastering in April *77 but was still doing patch work in May and June 1951 particularly in the kitchens and living rooms where telephone boxes had been removed.
The painting contractor began painting about January 18, 1951. Ordinarily the painters begin where the plasterers begin and follow the work of the plasterer after the plaster has had time to dry. Because of the disruption to both the plastering and painting operation both of these trades were shifting from one floor to another. The paint was changed from oil paint to casein paint. Some walls had to be repainted because of moisture damage, then after work was again directed towards apartment occupancy, the painters were required to and did paint all of the walls in the building over with oil paint as originally specified by the FHA specifications. Some of the lower floors ultimately had three complete paint jobs on the walls and all of the walls had two complete paint jobs instead of the one originally required. The painting contractor could have finished painting by March 1,1951, if the work had not been disrupted to accommodate occupancy by the Government.
40. The original plans for The State House called for no asphalt tile under kitchen base cabinets or stoves. Due to the expected occupancy by the Government the flooring contractor was directed to and did install asphalt tile in those areas.
41. Due to the fact that the plaintiff company expected to have the defendant occupy the premises when completed, it caused the furring strips, which had been installed in the walls of the kitchens for the purpose of supporting the wall cabinets, to be covered with molding or trim and this necessitated the painting of walls where paint would not otherwise have been needed. Then, when it became apparent that the Government would not be the tenant, the molding was removed and scrapped and the wall cabinets were attached to the painted walls.
42. It is clear from all the evidence in the record that the plaintiff would have completed the construction of its apartment house project much earlier than it did so had the negotiations with the defendant toward leasing the premises not taken place. The defendant admits that the project was *78 delayed one month. The plaintiff claims it was delayed on account of the above reported transactions with representatives of the defendant for a period of five months. It is found as a fact, on all of the evidence of record, that the plaintiff would have completed the construction of its apartment by no later than March 15, 1951, had it not disrupted its finishing operations to accommodate the Government as a tenant as described in the foregoing findings.
43.By letter dated December 11, 1951, amended by letter of May 14,1952, the plaintiff submitted a claim for damages to GSA. The plaintiff’s claim, with supporting documents, totaling $270,895.98, is itemized as follows:
1. Extra painting and plaster repair and patching_$27,760. 64
2. Plumbing changes_ 46,250. 59
3. Extra for asphalt title flooring in kitchens_ 501.20
4. Installing trim in kitchens and crating kitchen equipment_ 1, 023.96
6.Reassembling 312 gas ranges_ 175.04
6. Moving kitchen equipment to storage and return from storage- 5, 344. 00
7. Cleaning and debris removal_ 862.00
8. Extra to architect, superintendent of construction, rent for construction office, and telephone_ $9,140.33
9. Overhead to general contractor__ 6,822.40
10. General contractor’s fee_ 9, 778. 78
11. Rent for storage of kitchen equipment_ 7, 500. 00
12. Insurance on stored equipment_ 364.92
13. Blueprints furnished GSA_ 88. 00
14. Legal and executive services_ 15,000. 00
15. Loss of rent- 140, 284.12
270, 895.98
44. Upon receipt of the plaintiff’s claim, the Director of the Regional Office, GSA, empaneled a special board to consider the claim and submit recommendations. The special board consisted of Mr. Nathan Abramson, Assistant Chief, Construction and Repair Division, Region 3, GSA; George Smith, Manager, North Area, GSA; Joseph Yelardi, Chief, Buildings Operation Branch, Region 3, GSA. The special board held several meetings, considered the supporting data furnished by the plaintiff, conferred with representatives of the plaintiff, and thereafter submitted its recommendations.
45. The special board, on May 28,1953, recommended that the plaintiff’s claim be allowed in the amount of $82,539.29. The partial allowance of the claim by the special board and *79 the principal differences between the amount claimed and the amount recommended were with respect to the following items:
Amount claimed Amount recommended Item
$24,572.34 $16,696.11 1. Painting and plaster_
46,250.59 44 2. Plumbing__
15,000.00 1,000.00 14. Legal and executive services..
140,284.12 20,662.00 15. Rent loss.
46. On June 1, 1953 the General Accounting Office issued a certificate of settlement in connection with a similar claim by the owners of The Boston House by which an amount was found to be due based upon the rentals which the owners would have received during the term of the contemplated lease (ending June 30,1951).
47. Following the reasoning of the certificate of settlement in The Boston House matter, the GSA Washington Regional Office made a determination of the dates upon which its representatives regarded the various floors of The State House as ready for occupancy by the Government. The matter was submitted by letter of October 15, 1953, to the Claims Division of the GAO for direct settlement with the plaintiff, administratively approved by GSA for allowance in the amount which would have been due under the terms of the proposed lease had it been consummated, $51,245. When the above was called to the personal attention of Edmund F. Mansure, Administrator, GSA, he directed that the claim be withdrawn from the GAO in order that GSA might give it further consideration because Mr. Mansure was personally of the view that the above mentioned amount was grossly inequitable.
48. Further administrative consideration of the plaintiff’s claim was accomplished resulting in a report dated February 5, 1954 to the Administrator (GSA) entitled “Claim of The State House, Inc.,. Amount, $270,895.98” which reads as follows:
Subject claim arose out of negotiations between this Administration, the FHA and the claimant during the period November 1950 through April 1951 looking to *80 ward use for office purposes of an apartment building located at 2122 Massachusetts Avenue NW., Washington, D. C.
Upon receipt of the claim, presented by claimant’s letters of December 11, 1951, and May 14, 1952, I empaneled a special committee to consider it and recommend appropriate disposition.
The special committee, by memorandum of May 26, 1953, recommended allowance of the claim in the amount of $82,539.29. The principal differences between the committee’s recommendation and the amount claimed were with respect to item No. 1, painting and plastering; item No. 2, plumbing; item No. 14, legal services; and item No. 15, loss of rent. The differences concerning the other items all related to the number of months for which rental losses were recomended. The reasons in support of the committee’s recommendations are contained in the file.
Before the committee’s recommendations were processed for approval a certificate of settlement was issued by the GAO in a similar case, the Boston House, Inc., claim.
Proceeding under what I now feel was the erroneous belief that the position taken by the GAO on the Boston House, Inc., claim controlled the amount allowable on the State House, Inc., claim, the special committee’s recommendations were disregarded and the amount allowable under the rule in the Boston House, Inc., claim was determined.
The claim was then submitted by the Office of Controller by letter of October 15, 1953, to the GAO for direct settlement, administratively approved in the amount determined as stated above, $51,245.
The above-stated action thereafter came to the attention of the claimant who protested the amount of the administrative approval and appealed to you, whereupon you directed that the claim be withdrawn from the GAO for further administrative consideration.
Since return of the claim to this Administration for further consideration the Office of General Counsel has been studying the legal issues and representatives of that office and this regional office have given further study to the factual issues. I, personally, have participated in these latter studies which have included a thorough examination and review of the entire file and the detailed recommendations of the special committee with the committee members and further discussions with the claimant and his representatives.
*81 I have now been furnished with a memorandum of law by the Office of General Counsel wherein it is concluded that under the facts and circumstances of this case the Government is liable for such of the claimant’s necessary and reasonable costs directly resulting from the Government’s breach of the agreement to lease.
This is a case where the Government interrupted the construction of an apartment house and, acting in good faith, caused the builder to spend substantial sums of money converting the building for office use and then turned around and backed out of the deal, thereby causing the builder to have to undo all he had done and put the building back into condition for apartmental use. I have gained the impression from my examination into the claim that it seems to have been the purpose of everyone who has had anything to do with it since we backed out of the deal to get out of the situation at the least possible cost to the Government in complete disregard of the claimant’s actual costs and losses brought about by us. I don’t think that is the proper way. I believe we should pay the claimant every cent that he reasonably and necessarily spent or lost on account of our interference.
Upon the basis of my reconsideration of the various items comprising the claim and in the light of referenced memorandum of law, it is recommended that the claim be administratively approved in the amount of $187,-574.51, and that so approved it be resubmitted to the Comptroller General of the United States for decision and settlement. Attached hereto is schedule 1 which reflects the basis of computation of the amount recommended for approval.
William A. Miller,
Regional Director, Region 3.
Concurred in:
Jabíes B. C. Howe, Attorney.
J. E. Moody, Assistant General Coimsel.
Maxwell H. Elliott, General Counsel.
49. Schedule 1 referred to in the last sentence of the quoted report in the preceding finding is quoted in full below:
Schedule 1
Claim op The State House, INC., AmouNT $270,-895.98 — ComputatioN op Amount Administratively Recommended por Approval Upon Reconsideration op Claim
*82 Item No. 1 — Extra fainting and plaster repair and patching: claim, $27,706.61
(a) Painting claim, $24,572.34
The reasons advanced in the special committee’s report in support of its recommended reduction in this item to $17,124.29 do not appear adequate to warrant the reduction. Further, it seems clear that this painting was necessitated by reason of the Government’s action to acquire the property and that the claimed cost actually was incurred. Accordingly, the committee’s recommendation is not accepted and it is recommended that the item be approved as claimed. Approved, $24,572.34.
(b) Plaster repair and patching claim, $3,188.30.
The special committee’s recommendation on this item is approved for the reasons stated therein. Approved, $3,188.30; total amount approved, item No. 1, $27,760.64.
Item No. 2 — Plumbing changes: claim, $1¡,6$50.59
The special committee stated that it considered the costs included in this item and proceeded to estimate what, in their opinion the work could have been accomplished for, thus arriving at a total cost for the work of $22,813.44. The committee does not show the source from which the services could have been obtained for the amount of their estimate or whether, if obtainable, the services could, have been performed under the labor conditions existing on the job. The effect of the committee’s recommendation also, is to penalize the claimant for the cost of complying with a requirement of the District of Columbia plumbing inspector regarding sealing up drains. Although the amount claimed seems somewhat high, since the work clearly was necessitated by the Government’s action to acquire use of the property and since it appears that the claimant actually incurred the costs the committee recommendation is not approved and it is recommended that the item be approved in the amount claimed. Total amount approved, item No. 2, $46,250.59.
Item No. 3 — Asphalt tile -flooring: Claim, $501.20; approved, $501.20
Item No. I — Kitchen trim and crating equipment: Claim, $1,023.96; approved, $1,023.96
Item No. 5 — Reassembling gas ranges: Claim, $175.01; approved, $175.01
Item No. 6 — Moving Tcitchen equipment to storage and return: Claim $5r3$f; approved $5,311
*83 Item No. 7 — Gleaning and debris removal: Claim, $86%; approved, $86%
The committee recommendations for allowance of items 3 through 7 are approved for the reasons stated in the committee report.
Item No. 8 — -Extra to architect, superintendent, rent for construction office, amd telephone: Claim, $9,llfi.83
For the reasons reflected under item No. 15, this item is computed on the basis of a 3 months’ delay in completing the building for apartment house use rather than upon the basis of 1 month as recommended by the committee.
Monthly rate for all items $1,828.06: 3 months, $5,484.18.
Item No. 9 — Overhead: Claim, $6,8%%.lfi
This item was claimed at the rate of 7% percent on the foregoing items as claimed. The committee recommended exclusion of various items prior to application of the overhead rate on the theory that the items should not bear an overhead rate because they were in the nature of overhead costs. The committee also recommended reduction of the overhead rate. In view of the claimant’s explanation that the particular items involved are considered direct costs in his normal operations which is normal practice in the construction business and that his normal overhead rate is 7y2 percent, which seems entirely reasonable, the committee recommendations are not accepted and approval of the item at 7y2 percent on the above items as approved is recommended. Seven and one-half percent of $87,401.61 equals $6,555.12.
Item No. 10 — General contractors fee: Claimed, 10 percent of the foregoing items as claimed, $9,778.78
While the fee percentage claimed seems somewhat high the percentage recommended by the committee seems low. Accordingly, since computation of the contractor’s fee at 6 percent is customary in Government construction contracts approval of this item on that basis is recommended. Six percent of $87,401.61 equals $5,244.40.
Item No. 11 — Rent for storage of hitchen equipment: Claim, $7,500
This item clearly was incurred at the request of the Government. While it may well be that the rental rate was high, the suitability of the space was dictated by *84 the FHA and it appears that total of the items claimed actually was paid by the claimant. Nevertheless, in view of my findings with respect to item 15, below, I feel that allowance of this item must be limited to 3 months, at $1,250 per month, and it is so recommended. Three months, at $1,250 per month, $3,750.
Item No. 12 — Insurance on stored equipment: Claim, $861.92; approved, $36J¡,.92
Item No. 13 — Blueprints furnished GSA: Claim, $88; appro ved, $88
Approval of the committee’s recommendations on items 12 and 13 is recommended for the reasons stated therein.
Item No. 11 — Legal and executive services: Claim, $16,000
In view of the allowances recommended with respect to overhead (item No. 9) and the contractor’s fee (item 10) it is not believed that the contractor is entitled to any additional compensation or reimbursement for legal and executive services. Accordingly the committee’s recommendation is not acceptable and it is recommended that this item be disapproved in total.
Item No. 15 — Loss of rent: Claim, $llfi,281f,.l'8
The. committee recommends that the amount allowed for this item be limited to $20,662 computed upon the basis of only 1 month’s delay occasioned by the Government and a reduction in net income substantially below the contractor’s estimate. I have given especially careful consideration to this item. I can find no basis to disagree with the claimant’s estimate of net rental income, conceding, of course, that it must include a number of estimated factors. I find no justification for accepting the committee’s recommendations for reduction in the estimated net income. To the contrary I am' inclined to reject as unlikely the committee’s partial-vacancy estimate, especially during the time here involved, the middle of 1951. I believe we should accept, therefore, the claimant’s estimate of net income, $336,682. With respect to the period of time the owner was deprived of such net income as a direct result of the Government’s interference with the construction, I don’t believe that it is possible to measure and weigh all of the factors which must be considered and arrived at an exact determination of such period of delay. Clearly the committee’s recommendation of 1 month is unreasonable and fails to take into consideration all of the *85 factors. On the other hand I believe that the 5 months; claimed by the contractor is too long. Based upon my own firsthand knowledge of the circumstances as they existed, during the period of time involved and upon-: the basis of my own personal experience and knowledge* of construction matters, I believe that it can reasonably be said that the Government delayed the construction’ of this apartment house for at least 3 months. It is; my recommendation that allowances for rent loss be* computed on that basis. Three-twelfths of $336,682: equals $84,170.46.
Grand total recommended for allowance, $187,574.51-
Bespectf ully submitted.
William A. Miller.
February 5,1954.
50. On February 10, 1954, the claim of the plaintiff was; transmitted by Mr. Mansure for decision and settlement to. the Comptroller General of the United States. His letter-of transmittal of that date reads in part as follows:
Thereafter, the matter came to my personal attention.. Since the amount administratively recommended for allowance seemed grossly inequitable and since the claimant, who had not theretofore been notified of the amount-administratively recommended for allowance, advised, quite understandably, that he would not accept such amount in settlement of the claim even if approved by your office, I directed that the claim be withdrawn from, your office for further administrative consideration.
My General. Counsel has considered the legal issue involved in the situation — and advised me that, in his opinion, the authorities cited in the referenced certificate of settlement on the Boston House, Inc., case are not controlling in the instant case. It is his further opinions that, under all of the facts and circumstances of this, transaction, the claimant is entitled to recover all actual damages suffered, including his rent losses resulting f rom. the Government’s failure to consummate the contract; to lease. Included in the file is a memorandum of law-reflecting the conclusions of our General Counsel’s office..
Proceeding in the light of the referenced legal conclusions, William A. Miller, director of our Washington, regional office, reconsidered the claim and found that the amount of actual costs and losses arising out of the-transaction for which the claimant should be reimbursed" as a result of the Government’s failure to consummate-the contract to lease, aggregate, as an absolute minimum,, *86 the sum of $187,574.51 and recommended that the claim be approved, administratively, for allowance in said amount. There is included in the file a memorandum dated February 5, 1954, addressed to me by Regional Director Miller, reflecting the aforesaid recommendation and the basis therefor.
I have personally reviewed the facts and circumstances in this case as reflected by the record and have discussed it thoroughly with some of the officials of this Administration who participated in the original negotiations with representatives of the Federal Housing Administration and the claimant which led to the claimant’s present predicament. Also, I have reviewed in detail with representatives of this Administration the deliberations which resulted in Regional Director Miller’s recommendation for allowance of $187,574.51, and I must say that I wholeheartedly approve his recommendation.
It seems to me that the remarks of Associate Justice Proctor of the United States Court of Appeals here in the District of Columbia in the Goodman v. Dicker case, as quoted in the General Counsel’s legal memorandum contained in the file, are peculiarly applicable where, as here, a party; suffers substantial monetary injury through reliance in good faith upon assurances of officials of the Government of the United States acting within the scope of their authority. This seems particularly so where, as here, the executive agency representing the United States was precluded by circumstances beyond its control from concluding the lease transaction in a manner which would haye enabled full recovery by the party of his costs.
Surely, under the circumstances of this case, justice and fair dealing on the part of the United States not only permits but requires that the claimant be made as nearly whole as possible. Accordingly, it is recommended that the claim, submitted herewith for direct settlement by your office, be allowed in the amount of $187,574.51.
Lapsed appropriation “4710101, Emergency Operating Expenses, General Services Administration, 1951,” initially was available for payment of expenses of the transaction.
Sincerely yours,
EdmuND F. MaNsuee, Administrator.
Although there is no evidence in the record concerning the decision of the Comptroller General upon the claim of the *87 plaintiff, it is understood the Comptroller General denied the claim in full.
51. As to the amounts claimed by the plaintiff on account of Item 1, extra painting and plaster, the plaintiff paid to the painting contractor $24,572.34 in excess of the amount it would have been required to pay but for the disruption of the painting operations because of the expected occupancy by the Government. The plastering contractor was paid an additional amount of $3,188.30 for plaster repair which was due to the tearing out of the telephone terminal boxes in the living rooms, and the concealing of gas, water and waste lines in kitchens, all on account of expected occupancy by the Government.
52. The plaintiff paid to the plumbing contractor $46,250.59 more than the amount specified in the original contract for plumbing work in The State House. This was occasioned by the extra work caused by the expected occupancy by the Government.
53. By reason of changes incident to preparing its unfinished building for office use and later reconverting for apartment use, resulting in a five-month delay in completion, the plaintiff reasonably and necessarily expended or lost the following amounts:
1. Extra painting and plastering-$27,760.64
[painting_$24,572. 34]
[plastering- 3,188.30]
2. Extra plumbing charges_ 46,250.59
3. Asphalt tile flooring_ 501.20
4. Kitchen trim and crating equipment_ 1, 023.96
5. Reassembling gas ranges_ 175.04
6. Moving kitchen equipment to storage and return_ 5,344.00
7. Extra cleaning and debris removal_ 862.00
8. Extra to architect, superintendent, rent for construction office and telephone_ 9,140.33
Subtotal Items 1-8_ 91,057.76
9.Overhead: 7%% of $91,057.76_ 6,829.33
10. General contractor’s fee: 6% of $91,057.76- 5,463.47
11. Kent for storage kitchen equipment — 5 months at $1,250___ 6,250.00
12. Insurance on stored equipment- 364.92
13. Blueprints furnished GSA_ 88.00
The amount of rent which the plaintiff would have received from private tenants during the period in question was $336,682 .per year.